Good morning, judges. Good morning. May you please recall my name is Emmanuel Onyewa. I represent Mr. Harbhajan Singh, the petitioner in this case. And... You're Harbhajan Singh 1, because if you notice on the calendar, Harbhajan Singh 2 is here as well. I noticed that. I was nervous when I looked and I realized it was not me. Well, thank you very much for taking the time to listen to our plea before this Court. I will start by giving a little background to this case. This is a situation where this is a Real I.D. Act case, which means there's much more demand for documentation, because the idea being that people do appear, they'll tell a story, and there's no way for the Court to verify whether or not they're telling the truth. So the Real I.D. Act was passed, and so it requires the petitioner to present documentation of who he is. In this case, we did. My client is actually a very prominent person in India. He was an athlete, and he ran for the country, and he won awards. And all these were presented to the Court, including certificates when he won the 400 meters. So he was quite well-known. And then we did submit pictures of his events and his being on a podium and everything about him. And then we also presented two declarations, one from his mother, and I believe one from the village sarpanch, who's like the head of the village. So there was a lot of documentation presented to prove who he is and what he's trying to say. When he appeared before the Court, he told the story. And this Court has been pretty clear about what to use to judge credibility. There's something called internal consistency, which is whether or not the story you're telling is consistent. Well, okay. Let's kind of, since there's not a lot of time, let's sort of just jump to the Court made an adverse credibility call, right? Yes. And this is a little bit of a theme of what we have going on today. We have a number of immigrants where they went to Canada first, and then they came to the United States. And so he filed an asylum application in Canada, correct? Well, he was denied. And it was denied. And then he came here and filed an asylum application. And so I think what you, you know, I mean, what appears to be the elephant in the room is that he seems to have had a different basis for asylum, and the argument can be made that you tried one out and it didn't work, and so then you go, well, let's try something else. So does Mr. Singh maintain that he told the truth to both the Canadian and the American immigration authorities, or what's what? How do we look at this? Because, I mean, one, you know, it has to compel to reverse this to get a grant. It's got to compel the other result, or it can't be substantial. And if someone does two different theories on why they deserve asylum, that's not good for your client. I totally understand it, Your Honor. I appreciate you giving me the opportunity to clarify this issue. He never applied for asylum in Canada. He was interviewed at the airport. And if you read the court's decision, I'm sorry, I just clearly state that he was referred to the refugee unit. He did not appear before the refugee unit. So what happened was he was stopped. He was put in a dark room for 10 hours, and then he was asked some preliminary questions. And I have a copy of an entire questionnaire he was given in Canada. In court here in the United States, the IG is required to inquire of the applicant of any relief he might be eligible for. He's required to tell the applicant so the applicant knows what to prepare for. He was never given in India. In fact, they just asked him a few questions, then they let him go. So they didn't ask him is there any other reason why you were afraid to go back to India. This all took place within a very short time. And he was referred so he could have an opportunity to present the application, but he never did present the application because once he was released, you know, he ran away out of fear. So he never had an asylum application in Canada. Sotomayor, I'm sorry. He arrived in Canada. He was interviewed for purposes of asylum. He was not told. He was simply interviewed. They interview everybody who doesn't have documents at the airport. Okay. And there's a transcript of the interview. There is, yes. We're not really sure if it's a transcript, because I asked this question of the counsel when he wanted to present the documentation. Is this a transcript? Was it transcribed? Was this a facsimile? He didn't know. And he said he did. He was not sure. And so I argued against admissibility at that point and argued that he did not know what the documents were. And I asked him whether or not this was an asylum interview. He said he did not know. And I asked him whether or not this was a credible fear, the way we do here in the United States. He said he did not know. And so at that point, I argued to the Court that it shouldn't be admitted because it's not reliable. And I did know that they indicated I did not address this issue in my brief before the BIA, but I did address it. I'm trying to understand what your understanding of this document was. It's a little confusing. He was interviewed, and then what did he do? He was asked, you know, why are you afraid to go back to India? And he said, well, I had some problems with my family members over there. And then so they asked me a few questions about that. He gave me details about that. And then they asked him, well, where will you be going if you came to Canada? He said, I'll go to Gurdwara, which is a temple. And then which one? He said, the one closest by. And then they said nothing further. They did not ask him, were you ever arrested in India? Did you have any problems with the police? Did you have any problems with anybody? They didn't ask me all those questions. In the asylum office here, they would ask him all those questions to eliminate all the bases for which he might be able to do for relief. We do that here because the Court is required in 44 states. So after he was interviewed in Canada, I didn't understand where he went. Oh, well, he was released. And then he went to, I guess, he went to stay with relatives. And so he was supposed to have been given documentation. He never received those documents. In Canada. In Canada, to appear for an interview for asylum. He never did get those documents, so he never did appear. But he intended to apply for asylum. It was not clear whether he intended to apply for asylum. He was interviewed as a matter of course. Everybody gets interviewed at the airport. Well, no, if you have papers to get in, you don't. Just because you travel somewhere, you don't get interviewed for asylum. I mean, the reason is that you're entering and you don't have a right to come in, and so then you're referred to an asylum officer. And it's my understanding that, you know, at any point, you can receive asylum without even having to go to a hearing like it went to here. You know, I mean, there are ways, but like if the asylum officer doesn't feel that it's appropriate right then, then they refer it to the next step and the next step and the next step. So, I mean, it's a little bit hard for me to understand your argument that he wasn't seeking asylum because maybe he didn't finish the process. He went further here, right? Well, I don't know the Canadian asylum process, and I did indicate that to the Court. In fact, none of us did know the Canadian asylum process, including the Court. And what I only think it was brought in to show was that at some point he told a different story to somebody else. It was not brought in to show that he applied for asylum in Canada because the judge, the judge himself, indicated that he was referred without his knowledge. You're not contending that he had any other basis for seeking residence in Canada, do you, other than asylum? I do not know. Hold on. There's nothing in this record to indicate. There's nothing indicating that he would not apply for asylum in Canada had he been given the opportunity. But on the other hand, we do know for a fact he did not because he was merely interviewed for a few hours in Canada. He never went before an asylum officer. Well, but it's pretty hard to understand why when he was questioned in Canada that he didn't say something about these problems. I wanted to address that, but I note that I'm running a little bit short on time. But I was a journalist before I became a lawyer. And I remember one time Winnie Mandela came to our school. And I did an article on her where I pointed out her background as a civil rights leader and everything that happened in South Africa. She was upset about that because she came to talk about women's rights because she came from the Beijing conference. So she did not feel like she had to address those issues. And so it is not entirely impossible to imagine somebody coming from a place, arriving at a place not knowing fully why certain questions were being asked and why he should address those questions. So I'm not trying to excuse him not bringing up the story there. But he's not denying who he is and he's not denying that this story was told in Canada. Both may well be true. I have no way of knowing. I'm merely saying that in the United States, we have pre, especially in this circuit, we have pre-claimed indications of credibility. And in this case, it's eternally credible, eternally consistent. It's consistent with the country reports. He has very clear identification of who he is. And really all we have is IJ denying, refusing to look at all these issues because she's convinced he should have told the same story in Canada. And I'm saying that there wasn't the same opportunity. There wasn't the same motivation. All right. Do you want to save the balance for rebuttal? Thank you. May it please the Court. I'm Manning Evans for the government. I'm sorry. I didn't catch your name again. It's Manning Evans. Okay. Thank you. Even if this is not an asylum application, I mean, it's not entirely certain. It appears on a form that looks like an asylum application. But when you say this, what are you talking about? I'm referring to the documents from Canada, Your Honor. It's apparent from Petitioner's testimony during the hearing that he was asked to tell the Canadian officials about problems that he was having in India. And I point the Court to pages 102 and 117 of the record in particular, where Petitioner is saying, they asked me about the problems I had back home. And also, they asked me why I had come there. And I told them that I had come to save my life. He knew that he had to tell the Canadians why he was having a hard time in India. And yet he told them, yet he told the immigration judge in these proceedings that he didn't tell them too much about his problems being a Sikh in India. Or he didn't tell them at all. He waivers back and forth on that point. And what he says is he was having a land dispute with his family, right? That's what he told the Canadians according to – well, in fact, he admitted that in the proceedings here in the United States. And that's also reflected in the interview documents as well from Canada. Kagan. Would he ever deny that he was interviewed in Canada? No, Your Honor. I don't believe he did. I think that it's important as well to look at Petitioner's explanation for why he supposedly did not tell the Canadians about the problems that he had being a Sikh in India. He claimed that he was afraid to tell them about the police. That appears at 101 of the administrative record. And yet he was fully willing to tell, according to his testimony here, he said that he told the Canadian officials that the police were involved in the land dispute. And that appears at pages 95 and 96 of the administrative record. So he tells a completely inconsistent story when he's trying to explain why he didn't  So I think those three considerations, the nature of the questions being asked in Canada, and then the fact that knowing he has to tell them about danger, he doesn't tell them about the problem being a Sikh, and then he gives a poor explanation for why he didn't tell them. You take those three things together, and you have evidence that shows you cannot find compelling evidence that he was credible. And so this is post or pre-real ID? This is a post-real ID, Your Honor. So we're just, we're talking, we don't have to go to the heart? That's correct. Although, I think that a dramatic inconsistency in terms of the nature of the claim actually does go to the heart of the claim. To tell an entirely different story is saying there are two hearts of the claim and I can't decide. Well, I would agree with you. If they're completely different, that does go to the heart of the claim, if that's why you're asking to get asylum. So is there any way, you know, giving the Petitioner all inferences, is there any way to reconcile the two? Well, of course, that's not my job here, Your Honor, but I would say no. Well, it is in a sense your job as the government. If you really thought they were reconcilable, you don't pursue cases that? Well, that's correct, Your Honor. I mean, obviously, justice is what matters. And if we saw a claim that wasn't well supported or our position wasn't well supported, then we would try and do something about that. Was there an application for asylum filed in Canada? What is the nature of the document that was filed? I do not know exactly. The document does say that it's a claim to be a refugee. That looks very much like an asylum application. But I'm not an expert in Canadian procedure. There was no expertise presented during the hearing on the nature of Canadian proceedings. Now, that is slightly – it would be nice to have more information about that. But I'd also point out that at page 109, the immigration judge asked for a proffer from the Department of Homeland Security of what these documents are. And there's a discussion about these documents coming from Canada by way of DHS's officials in Canada. There's a case called Iango, which is cited in this Court's Vatiam decision. Vatiam is a Ninth Circuit case. Iango is a First Circuit case. Iango involves testimony by United States government officials that authenticates German immigration officials' documents. And I think that's essentially what we have here. Now, we don't have officials testify. We have a proffer. But the only objection to the proffer was that it was hearsay. And also there was some question about speculation. But I think that the proffer authenticated the documents, and there was no reason why the proffer wasn't good enough. Well, hearsay can come in in these hearings, correct? It's not like a criminal proceeding. That's correct, Your Honor. So it would more go to the weight than the admissibility. Exactly right. That's exactly right. So we believe that this was authenticated. And as far as reliability, the cases indicate there are many factors to consider when it comes to reliability. I'd like to point out three things about the document here. One is Petitioner had an interpreter that he said he understood during the Canadian proceedings, that's at pages 117 to 118 of the record. He was also asked in-depth questions at the interview in Canada. This is not just the perfunctory, what problems were you having, and then the next question is, when are you catching the next flight or something like that. This is several questions. It goes on for two and a half pages, asking him about what happened in India. And then finally, this is not a case where the documents come in at the end and the Petitioner's never asked about them. Well, now, the Petitioner doesn't. If my reading of the record is correct, he conceded that the documents included his signature, his handwriting, and his voting card with his picture and his high school matriculation documents. It's quite remarkable. There is absolutely no way that he can deny that those documents concerned him, and he really doesn't. I mean, he identified his signature, there are photographs he identified, the tattoos match up. There's no question that this man was in Canada and that he was interviewed by Canadian officials. We believe that in the absence of compelling evidence regarding the adverse credibility decision, that that should be upheld. We believe as well that the alien did not carry his burden of proof with respect to the declarations he offered. And so we would ask that the petition for review be denied. Mr. Evans, was he there four years and seven months to set the record? I believe Canada. Canada. I think the arrival date was 2002, and 2006 is when he claimed he came here.  I don't know whether or not that's actually a fact. I don't know. Thank you very much. Thank you. All right. There don't appear to be additional questions. Thank you. I just want to address a couple of things briefly. First one is the issue of admissibility versus weight. I do think in this case it's functionally the same thing, since the entire weight of the decision was based on this document only. Well, tell me what in this document says it's not authentic. And it seems that your client, you know, confirmed all of those things. So it's not just, as we've seen today, we have two Harbhajan Singhs. And then we have, this is our Singh calendar. We have two gender Singh and hard of Singh. So just being a Singh, certainly that wouldn't do it. But there's some pretty specificity here. What tells us it's not authentic based on your, you know, your client conceding that it was his handwriting, it's his signature, his voting card with his picture and his high school matriculation document? Sounds pretty specific. The issue we have is not with whether or not the documents themselves are authentic. The issue we have, and this is the issue the Court raised, what exactly they say, what exactly they mean. The three different documents are all put together. The interview with him has a signature on it. It's only two pages. The rest of the documents were not from the same proceedings. They were put together separately. And if you look at them, one of them contains a warrant for his arrest. This was done long after he was no longer in custody. But wasn't he impeached by what he didn't, by what was indicated in the interview that he didn't say the same things that he's saying now? No. All they're saying is that if he had the opportunity to tell the same story in the United States, he did not tell the same story in Canada. All we're saying is that both stories may well be true. So in other words, the fact that within a very short amount of time, you know, you could have many things that happened to you during the course of your life. Within a very short amount of time, you told one story that does not make the second one not true. If both stories are true, he will still be eligible for asylum. Well, he also could have gone to see a lawyer and his lawyer told him you're never going to get asylum in the United States because you have a land dispute with your sister and brother. It is entirely possible as well. But, Your Honor, that goes into speculation. Oh, I agree. I agree. But we have to compel to go otherwise. I understand, Your Honor. What I'm trying to say is that in this situation, the only evidence we have contradicting everything he says is the fact that something else could have happened to him in India. And we don't think that's enough basis to overcome all the evidence submitted, proving his story, including his pictures, including his identity, including all the information he has about things that happened to him. So the fact that at some point in a very condensed environment, he did not tell the same story does not mean the story is not true. Okay. You're over time, but I think Judge Schroeder has a question and then we'll – no? All right. So that will conclude. Thank you both for your argument. This matter will stand submitted.
judges: Pratt, Schroeder, Callahan